*Held,* that the plan and scheme adopted by the rapid transit commissioners in this case was not so indefinite that property owners could not act intelligently in giving or refusing their consent.

That the commissioners, in reaching a conclusion, were not bound to act solely upon the evidence produced before them, but had a right to examine the matter independently to view the situation and exercise their own judgment.

That, although the power to make a general plan, given to the rapid transit commissioners by section 4 of the act, upon which section the consent of the property owners might be said to be based, was modified by sections 6 and 14, which permitted detailed plans and specifications, and also alterations and additions to said plans and specifications, yet, inasmuch as section 14 provided that such alterations or deviations should not be inconsistent with the general plan of construction, the act did not deprive consenting owners of their property without due process of law.

That as the act required the successful bidder to give full security conditioned to complete the work, the objection that the act did not provide for the restoration of the street, in case the contracting company should fail to perform, was not tenable.

That the objection that the act did not secure abutting owners against consequential damages was not good, as the law gives them ample remedies for any injuries they may suffer.

That the objection that no provision was made in the act to compensate the abutting property owners for the soil taken out in forming a tunnel, could not prevail, since the legislature had a right to appropriate the soil of a street for the public use.

That, upon the question of the feasibility of a tunnel, having in view the possible damage to buildings on either side of the street, the court was of opinion that such a construction was possible, and that the only question presented thereby was as to the amount of the expenditure which it would be necessary to make therefor.

The rapid transit commissioners in the present case were appointed under the old Rapid Transit Act (chap. 606 of the Laws of 1875), and were continued in office by section 1 of the act of 1891, by section 4 of which latter act they were forbidden to construct a railway in certain streets.

The commissioners appointed to determine whether the routes recommended should be constructed, abandoned a line adopted by the rapid transit commissioners in Madison avenue, but reported favorably upon two proposed and complete routes, one upon the east and the other upon the west side of the city.

*Held,* that the rejection of some of the routes proposed by the rapid transit commissioners did not avoid the proceeding or make it necessary that the proceeding be begun anew.

THIS was a motion to confirm the report of three commissioners, appointed to determine whether a rapid transit railway or railways for the conveyance of persons and property, as determined by the Board of Rapid Transit Railroad Commissioners, for the city of New York, ought to be constructed and operated.

By section 5 of chapter 4 of the Laws of 1891, it is provided that the General Term shall appoint such commissioners.

The Board of Rapid Transit Commissioners were appointed, under chapter 606 of the Laws of 1875, and were continued in office by section 1 of chapter 4 of the Laws of 1891.

Section 4 of the act of 1891 forbids a railroad in Madison avenue, and in certain other streets and squares; and because of this prohibition a change was made by the commissioners appointed under section 5 of chapter 4 of the Laws of 1891, in one of the routes adopted by the Board of Rapid Transit Commissioners.

The commissioners appointed to determine whether the routes recommended should be constructed, therefore abandoned a line adopted by the rapid transit commissioners in Madison avenue, but reported favorably upon two proposed and complete routes, one upon the east and the other upon the west side of the city.

*Prescott H. Butler*, for Sarah A. Borell et al.

*S. P. Nash*, for Trinity Church Corporation.

*H. H. Man*, for the executors of Thomas Lewis.

*Berry Brothers*, for the National Park Bank.

*James M. Fisk*, for the Terminal Underground Railroad Co.

*S. Riker*, for the Trustees of Sailors' Snug Harbor.

*B. C. Wetmore*, for C. H. Contoit.

*J. Thomson*, for Park avenue property owners.

*O. B. Potter.*

——— *Irwin*, for Elliott F. Shepard.

*Lawson N. Fuller*, for the Washington Heights Property Owners' Association.

*Franklin Bartlett*, for Henry Mason et al.

*John M. Bowers*, for the Commissioners.

Per Curiam :

This court having heretofore appointed, pursuant to the provisions of section 5 of chapter 4 of the Laws of 1891, three commissioners to determine whether the routes, presented by the rapid transit commissioners appointed pursuant to said act, ought to be constructed and operated, and said commissioners having, after a public hearing of all parties interested, made a report that certain portions of such routes ought to be constructed and operated, this motion is now made to confirm said report.

Various parties, owners of property which it is claimed would be affected adversely by the construction of the road proposed, appeared and objected to the confirmation of said report upon various grounds. Many of these objections were considered and passed upon at the time of the original application for the appointment of commissioners by the property owners who then appeared, being, with but a single exception, different from those who appeared and objected upon this application.

It will not be necessary in the disposition of this motion to reconsider the objections now raised that were then disposed of, viz., that the plan and scheme adopted by the rapid transit commissioners were so indefinite that the property owners could not act intelligently in the giving or refusing of their consent.

Various other objections are now raised for the first time, although the condition of the problem remains the same as it did upon the original application.

It seems to be claimed upon the part of some of the objectors that the commissioners appointed by this court were only empowered to act upon evidence which might be produced before them in favor of, and in opposition to, the proposed scheme. We think that this is altogether too restricted a view of the powers of these commissioners, and that they had a right, independently, to examine the question for themselves, to see the situation, and to be guided in the conclusions at which they arrived, as well by their own judgment as by evidence which might be produced before them. And this is especially the case, in view of the fact that all the evidence which could possibly be produced must necessarily be in the nature of opinions, and not the asseverations of facts within the knowledge of the witnesses. It is a well recognized fact that in

cases of great public improvements the public at large, being interested, and to be benefited thereby, take little or no active interest in the furtherance of the work; whereas, the individual who fancies he sees injury to his property in the carrying out of the work, is diligent before the public authorities in presenting his objections. Therefore, if the commissioners had to depend entirely upon the public who are really interested in the work to present the claims of the enterprise in the shape of evidence which could be acted upon, their reliance would, indeed, be upon a broken reed, because what is everybody's business is nobody's business, and is never done. It is clearly within the contemplation of the legislature, in respect to this subject, that the commissioners appointed to act in these matters shall be governed by their own judgment, as that judgment may be affected by the evidence and arguments presented to them. The fact of the necessity of increased facilities of transit from one end of this island to the other has long been recognized, and the court cannot shut its eyes to its existence. Neither could these commissioners. And the object of the appointment of the rapid transit commission was, if possible, to adopt some plan by which this public need might be met. In the carrying out of this work, undoubtedly, individual losses and individual inconvenience may be sustained, for which the law furnishes no compensation. But such considerations cannot place a barrier against great public improvements, otherwise none would ever be constructed. The legislature, therefore, having, by the passage of the act under which these proceedings have been initiated, given expression to the demand of the people for additional facilities of transit, the court should aid in the carrying out of this enterprise, unless some imperative reasons are shown why it should not be undertaken. Merely speculative objections, the fears of the timorous, and the personal views of the few as to the feasibility of the enterprise, ought not to prevent or stand in the way of the taking of the subsequent steps which might lead to its completion. The same sort of objection, and from some of the same individuals, was heard at the time the Brooklyn bridge was projected. It was pronounced an engineering impossibility, and that no one would cross it because of its manifest insecurity, even if it were constructed, and disaster was predicted with as great certainty as it is now

urged against the present enterprise, yet the Brooklyn bridge was built, and we wonder now how it was possible that the public did without it. And it would now be difficult to find a man who would be willing that the bridge should be removed, even if its cost might be returned to the treasuries of the cities which furnished the means of construction.

A point has been urged which was not suggested upon the previous hearing, that the act is unconstitutional because it is calculated to deprive property owners of their property without due process of law, and because the powers given by section 6 of the "Rapid Transit Act," to make detailed plans and specifications, and the powers given by section 14 of the act, to alter or add to such detailed plans and specifications, are such as not only to deprive the property owner of the protection and assurance to which he was entitled under the consent originally given by himself or by the court, but, also, to impose upon him or his property the burden of a road of a character never contemplated by, and wholly unknown to him, for which his consent had never been asked and to which his consent would never have been given.

A brief examination of the act will show that this objection cannot prevail. It is to be observed that, prior to the asking for the consent of the property owner or of the court, a general plan of construction is all that is provided for by section 4, and that after a general plan of construction has been approved, and the route or routes determined, the commissioners were to proceed with their detailed plan of construction prior to advertising for the doing of the work. And section 14, to which attention is called, only provides for the alteration of this detailed plan, which is not to be in existence at the time the consent of the property owner or of the court is asked for; and it specifically provides that whatever alterations or deviations may be made, they shall not be inconsistent with the general plan of construction adopted under the provisions of section 4. These deviations from the detailed plan, authorized to be made, in no way affect the general plan to which the property owner gave his consent. The details in respect to which changes are authorized came into existence subsequent to the giving of the consent, and the statute, as already observed, is careful to preserve the integrity of the general plan which was consented to.

It has been further urged that there is no provision in the law for restoring the street, in case a company attempting to build this road shall fail after removing some or all of the subsoil of Broadway, and that there is no provision in the act to secure abutting owners against consequential damages; and that it is defective in not providing absolutely for the completion of the work after it should be partially done; and that the act is unconstitutional in not providing for payment for the soil under Broadway which will be taken out in the making of the tunnel. The difficulty with most of these objections is, that it is assumed that the rapid transit commissioners, in the subsequent prosecution of their work, will fail in the doing of the duty which has been imposed upon them by the Rapid Transit Act. The act expressly provides that the terms of sale shall require the successful bidder to deposit with the comptroller or chief fiscal officer of the city, in cash or approved securities, such amounts as the board shall deem sufficient to constitute a guaranty of full compliance with the terms of sale by the purchaser and by the corporation to be formed for the purpose of building and operating said railway as in the act provided. And it is to be presumed, in the consideration of the action of the rapid transit commissioners, that they will exact such security as will provide against any contingency of failure.

It is true that the act provides that, in case of failure, these securities or money shall be paid into the treasury of the city. But it would form a fund out of which the evils anticipated might easily be obviated.

The claim that there is nothing in the act to secure abutting owners against consequential damages in no way affects the validity of the legislation, as the law gives the property owners ample remedies for any injuries which they may suffer.

The objection that no provision is made for compensation for the soil which is taken out of the street, it seems to us, cannot prevail. If it was the case that the abutting owner had a right of property in the soil composing the street, then no sewer could be built, no water pipe laid, no grade changed, and no pavement laid without compensating him for the soil which might be removed in the making of these improvements. Whatever portion of the streets occupied by the soil is needed for its improvement for public use,

the legislature, through the proper authorities, has the right to appropriate.

The questions, then, resolve themselves down to the general proposition as to the feasibility of the enterprise; and it is urged against its feasibility that it will work irreparable injury to the buildings upon either side of the street in consequence of its method of construction. It is undoubtedly true that if any other means of effecting rapid transit were possible, or as possible as by means of a tunnel, it would be preferable. But the question before this court at the present time is not whether there may not be some other method of rapid transit which would be preferable, but whether the rapid transit commissioners having determined upon this plan as, in their judgment, the best, it should be carried out. And that is the only question now before the court.

We are of opinion, upon an examination of the facts, that the success of the enterprise is not a question of engineering, but a matter of finance; that the engineering problems can be overcome without any difficulty, providing the money is behind the engineer; and that, under the plan of construction adopted by the rapid transit commissioners, most, if not all, of the objections which have been raised to the fact of the railroad being constructed in a tunnel will be obviated. In the first place, there will be no combustion in the tunnel in the production of the motive power, which is a main cause of the vitiation of the atmosphere in the tunnel. In the next place, the cars will not be lighted either by gas or oil; and hence this source of pollution will be avoided. And, furthermore, in consequence of the rapid movement of the trains, it will be impossible for the air in the tunnel to stagnate, which is another prolific source of pollution; and there seems to be no difficulty whatever in successfully coping with the problem of ventilation.

But it is urged that people will not go down-stairs to take a train in a tunnel. But they will go up-stairs to the elevated railroad, and down-stairs therefrom to as great an extent as they will be required to go if the present scheme is carried out; and the approaches to the stations will be eminently more satisfactory in that they will be more commodious, entirely removed from the weather, and more easily kept clean and attractive.

The board of rapid transit commissioners, upon the confirmation

of this report, have the duty imposed upon them of making the detailed plans which are to control the method of construction and operation of the railroad in question. In these detailed plans a great number of things are to be provided for, and we are to presume that these commissioners will care for the interests of the public and the individuals who may be affected by the construction of the work in the perfection of these plans and the placing of such safe-guards around the proper performance of the work as will insure its speedy, stable and efficient construction. And it would seem that if a company can be found willing to undertake the work under proper conditions of indemnity (which we must assume the commissioners will exact) there is but little doubt of its successful completion.

Another objection is, however, urged, that by the legislature taking off a portion of the routes which had been adopted by the original rapid transit commission, the whole proceeding failed and was required to be reinstituted.

It seems to us to be perfectly clear, from the act under which these proceedings are taken, that if a variety of routes were adopted by the rapid transit commissioners, it was possible for the commissioners appointed by the court, or for the court, to reject some routes and adopt others. As long as one complete route was adopted the provisions of the act were complied with. It certainly was not within the scope of the legislative intention to make the whole scheme (where it is susceptible of being divided into integral parts) depend upon the rejection of each particular portion which might be entirely independent of the rest. In support of this view we have the authority of *The Matter of the New York Elevated Railroad Company* (70 N. Y., 327), in which it was held that under the old Rapid Transit Act, where different routes had been selected by the rapid transit commissioners, the commissioners appointed by the Supreme Court to determine whether the road should be built or not, might report in favor of one route and not in favor of another; and that all that was required, if there was any favorable report, was that it should be in favor of a complete road upon some route; and that where connections were proposed with other means of transit, they might determine that some connections should be made and others should not. Applying this rule

to the condition of affairs now before the court, it is to be observed that a complete route is reported favorably upon for the west side, and that another complete route in connection with other means of transit is reported upon for the east side. The east side makes its connection with other roads running into the city of New York; and in determining as to the necessity of a continuation of this route, undoubtedly the commissioners had a right to take into consideration the other means of transit which were in existence. In fact, they were bound to do so. The objection, therefore, that because Madison avenue was taken out, and because the commissioners have reported against the portion of the route beyond the said section of Madison avenue, the commissioners had exceeded their powers, cannot prevail.

We are, therefore, of opinion that the report should be confirmed and this work allowed to proceed.

Present — VAN BRUNT, P. J., O'BRIEN and PATTERSON, JJ.

Report confirmed and the work allowed to proceed.